IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EIT HOLDINGS LLC, a Delaware company,<br><br>    Plaintiff,<br><br>  v.<br><br>YELP!, INC., a Delaware corporation,<br><br>    Defendant.<br>                                   / | No. C 10-05623 WHA<br><br>**TENTATIVE CLAIM-CONSTRUCTION ORDER AND REQUEST FOR CRITIQUE** |

**INTRODUCTION**

In this patent-infringement action involving computer-network technology, the parties seek construction of six terms and phrases found in the one asserted patent. Those terms and phrases are construed below. The parties have until **NOON ON OCTOBER 20, 2011**, to submit a five-page critique (double-spaced, twelve-point Times New Roman font, with no footnotes and no attachments) limited to points of critical concern. This is an opportunity for each party to focus solely on its most cogent critique, not to rehash every point already made in the briefs and at the hearing.

**STATEMENT**

United States Patent Number 5,828,837, entitled "Computer Network System and Method for Efficient Information Transfer," was issued on October 27, 1998. It is the only patent asserted in this action. Plaintiff EIT Holdings LLC allegedly "holds the title by mesne assignments from

the inventor" (Third Amd. Compl. ¶ 13).  EIT commenced this action in December 2010 against multiple unrelated defendants;  all but Yelp!, Inc., the first-named defendant, were dismissed for misjoinder in May 2011 (Dkt. No. 86).

Only claims 40 and 41 from the '837 patent are asserted.  Claim 40 purported to disclose a device, and claim 41 purported to disclose a method.  Three of the terms and phrases construed by this order are means-plus-function limitations that appeared only in device claim 40.  The other three appeared in both asserted claims.  All six disputed terms and phrases are italicized in the claims below.

Claim 40 covered (col. 19:17–31):

> 40.  A master program module coupled to a *master node* and a *master database* for connecting information providers and user nodes for a computer network comprising:
>
> means for registering a first-time user of the computer network;
>
> *means for receiving*, through the *master node*, a user id and respective network address corresponding to a current user of the user node;
>
> means for accessing from the *master database* user profile information corresponding to the user id;
>
> *means for transmitting* to the user node, through the *master node*, a *reference* to target information corresponding to the accessed user profile; and
>
> *means for storing* a user report from the user node.

Claims 41 covered (col. 19:32–43):

> 41.  A method for connecting information providers and user nodes coupled to a *master node* and a *master database* comprising the steps of:
>
> receiving through the *master node* a user id corresponding to a current user of the user node;
>
> accessing from the *master database* user profile information corresponding to the user id and respective network address;
>
> transmitting to the user node, through the *master node*, a *reference* to target information corresponding to the accessed user profile; and
>
> storing a user report from the user node.

The invention that the '837 patent purported to disclose related "generally to computer networks that connect information providers and end-users of network services." It particularly concerned "providing directed information to users and gathering user reports" (col. 1:7–11). In the prior art, a user could connect to a network service to view or download information requested by the user. The purported invention made further use of such an established user-network connection by sending the user unsolicited information likely to be of interest to the user (in addition to any information requested by the user), and by collecting information about the user. The specification emphasized the importance of doing so without slowing the rate at which information requested by the user was provided. Thus, "[t]his invention use[d] otherwise idle bandwidth by transmitting information specific to a user's profile while minimizing additional delay to the normal network traffic, and generate[d] a report of user responses for information providers with accurate assessment of user demand" (col. 7:33–37). The bandwidth-conservation aspect of the purported invention, however, was not specifically addressed in the two asserted claims.

The preferred device embodiment of the purported invention was depicted as follows.

3

Figure 1 from the '837 Patent:
A Preferred Embodiment of the Computer Network



The master node depicted as item 130 and the master database depicted as item 143 represent two of the phrases to be construed.

The parties' claim construction disputes are driven by their invalidity quarrels. Yelp! is poised to argue that its proposed claim constructions render the asserted claims invalid, either because they are indefinite or in light of prior art references. EIT, on the other hand, proposes narrower claim constructions which, in its view, preserve the validity of the asserted claims. Each of the disputed terms and phrases is addressed in detail below. This order follows full briefing and a hearing.

4

**ANALYSIS**

Courts must determine the meaning of disputed claim terms from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). While claim terms "are generally given their ordinary and customary meaning," the "claims themselves provide substantial guidance as to the meaning of particular claim terms." As such, other claims of the patent can be "valuable sources of enlightenment as to the meaning of a claim term." Critically, a patent's specification "is always highly relevant to the claim construction analysis." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–15 (Fed. Cir. 2005) (en banc) (internal quotations omitted). Indeed, claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Finally, courts also should consider the patent's prosecution history, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." These components of the intrinsic record are the primary resources in properly construing claim terms. Although courts have discretion to consider extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and inventors, such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317–18 (internal quotations omitted).

Means-plus-function claim limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the recited function. 35 U.S.C. 112 ¶ 6. To construe such a limitation, a court first must identify the claimed function and then must identify the recited structure in the specification that is capable of performing the recited function. A means-plus-function claim limitation does not include elements that are not necessary for performing the recited function. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

While this order acknowledges that the parties have a right to the construction of all disputed claim terms by the time the jury instructions are settled, the Court will reserve the

5

authority, on its own motion, to modify the constructions in this order if further evidence — intrinsic or extrinsic — warrants such a modification. Given that claim construction is not a purely legal matter, but is (as the Supreme Court describes it) a "mongrel practice" with "evidentiary underpinnings," it is entirely appropriate for the Court to adjust its construction of claims prior to trial if the evidence compels an alternative construction. *Markman*, 517 U.S. at 378, 390. The parties should be aware, however, that they are *not* invited to ask for reconsideration of the constructions herein. Motions for reconsideration may be made only in strict accordance with the rules of procedure, if at all.

### 1. "REFERENCE."

The parties dispute the term "reference," which appeared in both of the asserted claims. Device claim 40 included a "means for transmitting to the user node, through the master node, a *reference* to target information corresponding to the accessed user profile" (col. 19:28–30) (emphasis added). Method claim 41 included a step of "transmitting to the user node, through the master node, a *reference* to target information corresponding to the accessed user profile" (col. 40–42) (emphasis added). The parties' proposed constructions are shown below.

| EIT'S PROPOSED CONSTRUCTION | YELP!'S PROPOSED CONSTRUCTION |
|---|---|
| "dynamically generated pointer" | plain meaning |

The construction of this term is relevant to the parties' invalidity arguments. Yelp! contends that the plain meaning of "reference" is broad enough to encompass invalidating prior art, whereas EIT contends that the patent used the term in a narrow, technical sense. For example, the parties dispute whether an icon may be considered a type of reference.

The asserted claims provided few clues as to the meaning of the term "reference." In both of the asserted claims, a reference to target information was transmitted to the user node through the master node. Neither asserted claim, however, illuminated what the reference was or how it functioned or was used.

Other claims explained that after a user node received a reference to target information, the user node could use the reference to request the transfer of target information from a master

6

1  node to the user node (col. 21:7–10). Furthermore, "another reference to new target information"
2  could be obtained as well (col. 19:66–67). The claims also disclosed references to other objects
3  besides target information. For example, claim 7 disclosed a "reference to a segment list" and a
4  "reference to a target information list." These references to lists were described as being
5  "access[ed]" (col. 8:57–63).

6  The specification of the '837 patent is only three and a half pages long. It said that "target
7  information references" may be contained within a master database (col. 3:54–56) and that a
8  master program ccould "identify the reference to the corresponding item" in an information item
9  list stored in the master database (col. 4:56–58). The prosecution history did not provide any
10 insight regarding the term "reference." The parties have not supplied any extrinsic evidence
11 showing how the term "reference" would have been understood by a person of ordinary skill in
12 the art at the time the patent application was filed.

13 Having carefully considered the record, this order concludes that the term "reference"
14 need not be construed at this time. The patent used the term generally to mean something that
15 refers to something else. This plain meaning will be apparent and understandable to a jury.
16 Neither the claims, nor the specification, nor the prosecution history provided any additional
17 detail that would make for a useful construction.

18 EIT's arguments for construing "reference" as "dynamically generated pointer" are not
19 persuasive. *First*, there is no support for the notion that references are dynamically generated.
20 The fact that *user reports* are generated "to create a more attractive and dynamic network service
21 environment" does not show that *references* are dynamically generated (cols. 2:14–17, 3:3–5).
22 The fact that "another reference to new target information" may be obtained "in accordance with
23 the updated information" does not show that the new reference was dynamically generated
24 (col. 7:11–13). *Second*, a reference is not necessarily a pointer. EIT cites a portion of the
25 specification describing items within user lists and segment lists as pointing to other items within
26 other lists. Those items, however, were not described as "references" (*see* col. 4:38–45). The
27 only references mentioned in that passage were "user profile references" to lists, not items within
28 lists. A later passage mentioned references to items of information within a list, but that passage

7

1  described a different embodiment and did not mention pointing (*see* col. 4:57–58). *Third*, EIT's
2  argument that an icon does not qualify as a type of reference is a summary judgment argument. It
3  is tangential to the question of how the term "reference" should be construed, and it need not be
4  addressed in this claim construction order.

5  In arguing for its proposed construction, EIT stresses "the canon that courts should
6  attempt to construe claims to preserve their validity." *Omega Eng'g, Inc. v. Raytek Corp.*,
7  334 F.3d. 1314, 1335 n.6 (Fed. Cir. 2003). This canon, however, does not require adopting a
8  proposed construction that is wholly unsupported by the record. The canon has not been applied
9  broadly but rather has been limited "to cases in which the court concludes, after applying all the
10 available tools of claim construction, that the claim is still ambiguous." *Broadcom Corp. v.*
11 *Qualcomm Inc.*, 543 F.3d 683, 690 (Fed. Cir. 2008). This is not such a case.

12 EIT also argues that the term "reference" should be construed now, because choosing not
13 to do so would simply save the parties' dispute for another day (Reply Br. 2). That may be so.
14 On the present record, however, the term reference "reference" cannot be meaningfully construed.
15 The intrinsic evidence does not illuminate the precise meaning of that term to one of ordinary
16 skill in the pertinent art at the time the patent was filed, and the parties have not supplied any
17 relevant extrinsic evidence. If construction of the term "reference" proves necessary, it will be
18 construed either on summary judgment or before the jury is charged at the end of the trial, and its
19 construction will be based upon a more fully developed record. In sum, the term "reference" will
20 not be construed at this time.

21       **2.     "MASTER NODE."**

22 The parties dispute the phrase "master node," which appeared in both of the asserted
23 claims. In each claim, it appeared in the preamble and in two limitations. It is italicized in the
24 claims below.

8

40.   A master program module coupled to a *master node* and a master database for connecting information providers and user nodes for a computer network comprising:

    means for registering a first-time user of the computer network;

    means for receiving, through the *master node*, a user id and respective network address corresponding to a current user of the user node;

    means for accessing from the master database user profile information corresponding to the user id;

    means for transmitting to the user node, through the *master node*, a reference to target information corresponding to the accessed user profile; and

    means for storing a user report from the user node.

41.   A method for connecting information providers and user nodes coupled to a *master node* and a master database comprising the steps of:

    receiving through the *master node* a user id corresponding to a current user of the user node;

    accessing from the master database user profile information corresponding to the user id and respective network address;

    transmitting to the user node, through the *master node*, a reference to target information corresponding to the accessed user profile; and

    storing a user report from the user node.

The parties' proposed constructions are shown below.

| EIT'S PROPOSED CONSTRUCTION | YELP!'S PROPOSED CONSTRUCTION |
|---|---|
| "web connected server or cluster of servers and point of connection into a network" | "a point of connection for an information provider into a network" |

The parties agree that a master node is a point of connection into a network, but they disagree whether it must be for an information provider and whether it must be a web-connected server or cluster of servers. The construction of this phrase is again relevant to the parties' invalidity arguments. Yelp! argues that the master node of the '837 patent need not be web-connected and

9

1   that non-internet prior art invalidates the asserted claims.  Yelp! also hopes to rely on prior art
2   that does not require a separate hardware structure for the master node.

3         This order agrees with the parties that, as a node, a master node is a point of connection
4   into a network.  The asserted claims illustrated that the master node also is a point through which
5   items are transmitted and received.  In claim 40, a user id corresponding to the current user of the
6   user node was received by the master program module "through the master node" (col. 19:22–24).
7   Similarly, a reference to target information was transmitted from the master program module to
8   the user node "through the master node" (col. 19:28–29).  Claim 41 did not disclose a master
9   program module, but it recited receiving a user id "through the master node" and transmitting to
10  the user node a reference to target information "through the master node" (col. 19:35–36, 40–41).
11  Both asserted claims identified "connecting information providers and user nodes" as the purpose
12  of the purported invention (col. 19:18–19, 32–33).  Thus, the user node is a point of connection
13  into a network, through which items are transmitted and received, to facilitate communication
14  between an information provider and a user node.

15        The other claims made similar use of the phrase "master node."  Some claims described
16  additional functionality of the master node that was not disclosed in the asserted claims;  for
17  example, claim 13 detailed various means by which the master node could monitor and
18  accommodate network traffic (col. 11:38–63).  The asserted claims, however, attributed no such
19  functionality to the master node.  Similarly, the specification described various elements and
20  embodiments of the master node that were not required by the language of the asserted claims
21  (*e.g.*, cols. 2:36–45, 3:42–44).  The prosecution history did not provide any further illumination of
22  the phrase "master node."

23        Contrary to EIT, a master node need not be a server or cluster of servers.  True, the
24  specification stated that a master node "is preferably a server" (col. 3:42).  This description of the
25  preferred embodiment, however, did not require *all* possible embodiments of a master node to be
26  servers.  The master node also need not be connected to the web.  Again, the fact that the
27  preferred embodiment used the internet did not limit other embodiments.  The specification listed
28

10

the internet as only one of several types of computer networks to which the purported invention could be applied (col. 1:12–16).

In light of the foregoing, the phrase "master node" shall be construed to mean "point of connection into a network, through which items are transmitted and received, to facilitate communication between an information provider and a user node."

### 3. "MASTER DATABASE."

The parties dispute the phrase "master database," which appeared in both of the asserted claims. In each claim, it appeared in the preamble and in one limitation. Claim 40 recited "[a] master program module coupled to a master node and a *master database* for connecting information providers and user nodes for a computer network comprising . . . means for accessing from the *master database* user profile information corresponding to the user id . . ." (emphasis added). Claim 41 recited "[a] method for connecting information providers and user nodes coupled to a master node and a *master database* comprising the steps of . . . accessing from the *master database* user profile information corresponding to the user id and respective network address . . ." (emphasis added). The parties' proposed constructions are shown below.

| EIT'S PROPOSED CONSTRUCTION | YELP!'S PROPOSED CONSTRUCTION |
|---|---|
| "collection of information including user profile information and target information list" | "database from which a master program accesses information. A database is an organized collection of electronic information." |

Citing extrinsic dictionaries, the parties agree that the master database is a collection of information. They disagree, however, as to what other details should embellish that basic description. The parties have not explained how the construction of "master database" relates to their infringement or invalidity arguments.

The dictionaries cited by the parties persuasively showed that a database is a collection of information. The context of the patent — *i.e.*, computer networks — strongly suggested that the collection of information is stored in an electronic format. More specifically, the asserted claims disclosed that user profile information could be accessed from the master database (col. 19:25–26, 37–38). Claim 40 disclosed a master program module as having a means for doing so, but claim

11

1   41 contained no such limitation on what may access the information in the database. The other
2   claims and the specification refered to the master database in a consistent manner, and the
3   prosecution history did not bear upon the construction of this term. Thus, the master database is a
4   collection of electronic information from which user profile information can be accessed.
5   Contrary to EIT, the concept of accessing information is not redundant and would not confuse
6   a jury.

7   The parties' other proposed descriptors are not supported by the record. *First*, EIT cites
8   only to the preferred embodiment to support its theory that the master database must contain a
9   target information list. No such list was mentioned in the asserted claims. This limitation will
10  not be read into them from the description of a preferred embodiment in the specification.
11  *Second*, as stated, claim 41 did not require the master database information to be accessed by the
12  master program. Adding such a limitation would change the scope of that claim. *Third*, Yelp!
13  relies on a general dictionary and a technical dictionary to support its proposed modifier
14  "organized," but neither of those cited references even used that term. The intrinsic evidence
15  made no reference to the organization of information in the master database, and Yelp!'s extrinsic
16  evidence is weak.

17  In light of the foregoing, the phrase "master database" shall be construed to mean "a
18  collection of electronic information from which user profile information can be accessed."

19  **4.    "MEANS FOR RECEIVING."**

20  The parties dispute the phrase "means for receiving," which appeared in asserted device
21  claim 40 of the '837 patent. The phrase appeared in only one limitation of the claim: "*means for*
22  *receiving*, through the master node, a user id and respective network address corresponding to a
23  current user of the user node" (emphasis added). The parties agree that the phrase is a means-
24  plus-function limitation and that the relevant function is "receiving, through the master node, a
25  user id and respective network address corresponding to a current user of the user node." The
26  parties' proposed constructions identifying the relevant structure are shown below.

|  | **EIT'S PROPOSED CONSTRUCTION** | **YELP!'S PROPOSED CONSTRUCTION** |
|---|---|---|
|  | Structure: "web server of master program and equivalents" | Structure: "master program" |

The construction of this phrase is relevant to the parties' invalidity arguments. Yelp! argues that the only corresponding structure disclosed in the specification for any of the three disputed means-plus-function limitations was "master program." According to Yelp!, this disclosure was inadequate and rendered claim 40 invalid as indefinite for lack of adequate corresponding structure under 35 U.S.C. 112 ¶ 6 (Opp. 23). *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.").

Claim 40 listed a "means for receiving . . . a user id and respective network address" as one of the elements comprising a "master program module." The other claims and the specification were consistent. For example, the summary of the invention stated that the "master program module . . . include[d] . . . means for receiving the user id and respective network address" (col. 2:45–47). Thus, the structure that performs the receiving function is an element within the master program module.

Only one device embodiment was described in enough detail to identify any structures within the master program module. As depicted in Figure 1, the master program module of that embodiment contained five elements: the master program itself, plus a client control program, an authentication program, a web server, and a Sybase sql-server, all within the master program (col 3:50–60).

13



Detail from Figure 1 from the '837 Patent:
A Preferred Embodiment of the Master Program Module

The only one of those five elements ever described as performing the "receiving . . . a user id and respective network address" function was the master program, identified as item 140 in Figure 1. In describing a method embodiment, the specification stated: "When a user connects to ISP **150** (step **502**), ISP **150** *notifies master program 140 of the user's identity and network address* (step **506**)" (col. 4:51–53) (emphasis added). Thus, the master program was identified as the structure within the master program module that performed the "receiving . . . a user id and respective network address" function. Every other mention of the relevant function referred only generally to the master program module as a whole, without identifying any specific structure within it as performing the function.

     EIT's theory that the web server, depicted as item 148 in Figure 1, is the structure that performs the "receiving" function is not supported by the record. EIT cites a description of the web server as "provid[ing] a home page for user registration, information, and maintenance" (col. 3:58–60). This *providing* function is not the same as *receiving* a user id and network address. A "structure disclosed in the specification is [a] 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The web server was not clearly linked or associated with the function of "receiving . . . a user id and

14

respective network address." EIT's emphasis on the canon that courts should attempt to construe claims to preserve their validity does not overcome the utter lack of record support for EIT's theory.

In light of the foregoing, the phrase "means for receiving" shall be construed to refer to the master program and equivalent structures.

### 5. "MEANS FOR TRANSMITTING."

The parties dispute the phrase "means for transmitting," which appeared in asserted device claim 40 of the '837 patent. The phrase appeared in only one limitation of the claim: "*means for transmitting* to the user node, through the master node, a reference to target information corresponding to the accessed user profile" (emphasis added). The parties agree that the phrase is a means-plus-function limitation and that the relevant function is "transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile." The parties' proposed constructions identifying the relevant structure are shown below.

| EIT'S PROPOSED CONSTRUCTION | YELP!'S PROPOSED CONSTRUCTION |
|---|---|
| Structure: "web server of master program and equivalents" | Structure: "master program" |

The construction of this phrase is relevant to the parties' invalidity arguments. As with the "means for receiving" phrase, Yelp! argues that the only corresponding structure was "master program," and that such a generalized structure was inadequate in this context.

Claim 40 listed a "means for transmitting to the user node, through the master node, a reference to target information" as one of the elements comprising a "master program module." The other claims and the specification were consistent. For example, the summary of the invention stated that the "master program module . . . include[d] . . . means for transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile" (col. 2:45–52). Thus, the structure that performs the transmitting function is an element within the master program module.

As discussed with reference to the receiving function, only one embodiment was described in enough detail to identify any structures within the master program module, and it

15

1  included five elements: the master program itself, plus a client control program, an authentication
2  program, a web server, and a Sybase sql-server (col 3:50–60; Figure 1). As before, the master
3  program was the only one of those five elements described as performing the relevant function.
4  In describing a method embodiment, the specification stated: "*Master program **140** transmits the*
5  *identified reference* [to the corresponding item of information item list **430**] to Client **122** of user
6  node **120** (step **512**)" (col:4:56–60) (emphasis added). Thus, the master program was identified
7  as the structure within the master program module that performed the "transmitting to the user
8  node . . . a reference to target information" function. Every other mention of the relevant function
9  referred only generally to the master program module as a whole, without identifying any specific
10 structure within it as performing the function.

11  EIT's theory that the web server, depicted as item 148 in Figure 1, is the structure that
12 performs the "transmitting" function is not supported by the record. The description of the web
13 server as "provid[ing] a home page for user registration, information, and maintenance" did not
14 clearly link or associate the web server with the function of transmitting to the user node a
15 reference to target information (col. 3:58–60). As before, EIT's emphasis on the principle that
16 courts should attempt to construe claims to preserve their validity does not overcome the utter
17 lack of record support for EIT's theory.

18  In light of the foregoing, the phrase "means for transmitting" shall be construed to refer to
19 the master program and equivalent structures.

20  **6.  "MEANS FOR STORING."**

21  The parties dispute the phrase "means for storing," which appeared in asserted device
22 claim 40 of the '837 patent. The phrase appeared in only one limitation of the claim: "*means for*
23 *storing* a user report from the user node" (emphasis added). The parties agree that the phrase is a
24 means-plus-function limitation and that the relevant function is "storing a user report from the
25 user node." The parties' proposed constructions identifying the relevant structure are
26 shown below.

16

| EIT'S PROPOSED CONSTRUCTION | YELP!'S PROPOSED CONSTRUCTION |
|---|---|
| Structure: "sql-server of master program and equivalents" | Structure: "master program" |

The construction of this phrase is relevant to the parties' invalidity arguments. As with the other two means-plus-function phrases, Yelp! argues that the only corresponding structure was "master program," and that such a generalized structure was inadequate in this context.

Claim 40 listed a "means for storing a user report from the user node" as one of the elements comprising a "master program module." The other claims and the specification were consistent. For example, the summary of the invention stated that the "master program module . . . include[d] . . . means for storing the user report from the user node" (col. 2:45–53). Thus, the structure that performs the storing function is an element within the master program module.

As discussed with reference to the receiving and transmitting functions, only one embodiment was described in enough detail to identify any structures within the master program module, and it included five elements: the master program itself, plus a client control program, an authentication program, a web server, and a Sybase sql-server (col 3:50–60; Figure 1). Once again, the master program was the only one of those five elements described as performing the relevant function. In describing a method embodiment, the specification stated that the "master program **140** updates master database **143** with the user report (step **542**)" (col. 7:9–11). Thus, the master program was identified as the structure within the master program module that performed the function of "storing a user report from the user node." Every other mention of the relevant function referred only generally to the master program module as a whole, without identifying any specific structure within it as performing the function.

EIT's theory that the sql-server, depicted as item 142 in Figure 1, is the structure that performs the "storing" function is not supported by the record. The two-way arrow connecting the sql-server with the master database in Figure 1 was not a clear indication that the sql-server performed the function of storing a user report. The description that the sql-server "accesses a master database" also did not provide a clear link or association with storing a user report

17

(col. 3:53–54). Indeed, this "accessing" of the master database may be for the sole purpose of retrieving, rather than storing, information. Finally, EIT's emphasis on the principle that courts should attempt to construe claims to preserve their validity fails once more to overcome the utter lack of record support for EIT's theory.

In light of the foregoing, the phrase "means for storing" shall be construed to refer to the master program and equivalent structures.

## CONCLUSION

The constructions set forth above will apply in this dispute. The Court will reserve the authority, on its own motion, to modify these constructions if further evidence warrants such a modification. Additionally, by **NOON ON OCTOBER 20, 2011**, each side may file a five-page critique (double-spaced, twelve-point Times New Roman font, with no footnotes and no attachments) limited to points of critical concern. This is an opportunity for each party to focus solely on its most cogent critique, not to rehash every point made in the briefs and at the hearing. No replies, please.

**IT IS SO ORDERED.**

Dated: October 13, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE