IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EIT HOLDINGS, LLC,

    Plaintiff,

  v.

YELP! INC.,

    Defendant.

No. C 10-05623 WHA

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this patent infringement action involving computer-network technology, defendant moves for summary judgment of invalidity. For the reasons stated below, the motion is **GRANTED**.

## STATEMENT

In December 2010, plaintiff EIT Holdings, LLC asserted claims 40 and 41 of United States Patent Number 5,828,837 against multiple unrelated defendants; all but Yelp!, Inc., the first-named defendant, were dismissed for misjoinder (Dkt. No. 86). The '837 patent entitled "Computer Network System and Method for Efficient Information Transfer," was filed in April 1996 and issued two years later. Broadly, the '837 patent claimed a network architecture that efficiently controlled the flow of the network traffic to deliver targeted information to the user based on information previously obtained on the user.

Below is an illustration of the preferred embodiment of the invention.



Claim 40 was written in means-plus-function form:

> A master program module coupled to a master node and a master database for connecting information providers and user nodes for a computer network comprising:
>
> means for registering a first-time user of the computer network;
>
> means for receiving, through the master node, a user id and respective network address corresponding to a current user of the user node;
>
> means for accessing from the master database user profile information corresponding to the user id;
>
> means for transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile; and
>
> means for storing a user report from the user node.

2

Claim 41 was written as a method claim, but otherwise paralleled claim 40, with minor differences:

> A method for connecting information providers and user nodes coupled to a master node and a master database comprising the steps of:
>
> > receiving through the master node a user id corresponding to a current user of the user node;
> >
> > accessing from the master database user profile information corresponding to the user id and respective network address;
> >
> > transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile; and
> >
> > storing a user report from the user node.

A claim construction order was issued in October 2011 (Dkt. No. 134). In this motion, Yelp argues that the '837 patent is anticipated by and obvious under the Fishwrap System and United States Patent Number 5,754,938. Yelp also argues that claim 40 lacked a definite corresponding structure and is therefore invalid under 35 U.S.C. 112. This order finds that the asserted claims are invalid as anticipated by the '938 patent prior art, and therefore does not reach Yelp's other arguments.

**ANALYSIS**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Another patent by a different inventor is prior art if the application was filed before the patent-at-issue was invented. Even if the anticipating patent is issued afterward. 35 U.S.C. 102(e). A determination that a patent is invalid as being anticipated under 35 U.S.C. 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1383 (Fed. Cir. 2001).

3

### 1. BACKGROUND ON THE '938 PATENT PRIOR ART.

The '938 patent was filed October 31, 1995. EIT does not dispute that it is prior art. The '938 patent disclosed a news-clipping-service electronic system wherein news articles were selected for a user based on the user's past activities. Information providers (news journals) were connected with the user through a proxy server that knew the user by a pseudonym (user id).

A proxy server maintained a user profile with information about each user, such as the user's interests, preferences, and network activity. Based on the user-profile information, providers were able to customize their content to send to the user (Schmandt Decl. Exh. 1 ['938 patent] at 32:34–45). At predetermined times, the system sent a list of news articles to the user for review (Schmandt Decl. Exh. 1 at Abstract). The user would select to read or not the articles on the list, and the user profile would be updated based on the user's feedback (Schmandt Decl. Exh. 1 at col. 17:18–44). Figure 10 depicted a flow diagram on how this was intended to function:

Figure 10 from the '938 patent



4

### 2. METHOD CLAIM 41 WAS ANTICIPATED.

For organizing this order, each section below is titled with a claim limitation.

**A. Preamble: a method for connecting information providers and user nodes coupled to a master node and a master database comprising the steps of.**

Broadly, the '938 patent specification disclosed a proxy server that connected users and information providers using network communication and database functions. This matched the preamble of claim 41. To better understand why, it is helpful to match equivalent terms from the '938 patent to terms in claim 41. The proxy server was equivalent to the master program. The proxy server's network communication function was equivalent to the master node. The user was equivalent to the user node. The pseudonym was equivalent to the user id. And the proxy server's database function was equivalent to the master database. The reason for these equivalencies will be explained as each limitation is discussed.

**B. Receiving through the master node a user id corresponding to a current user of the user node.**

The '938 patent disclosed a proxy server that received, through its network communication function, pseudonyms from users. This was equivalent to claim 41's limitation of "receiving through the master node a user id corresponding to a current user of the user node."

The '938 patent's proxy server operated using pseudonyms that identified the user to the proxy server. In turn, the information providers relied on the pseudonyms without knowing the user's true identity. As defined in the '938 specification, a pseudonym was an artifact, such as binary numbers, that allowed a service provider to communicate with users and build and accumulate records of their preferences over time, while at the same time remaining ignorant of the users' true identities (Schmandt Decl. Exh. 1 at col. 31:48–57). A pseudonym was equivalent to a user id in claim 41. EIT does not contest this point.

The user transmitted his particular pseudonym to log in (Schmandt Decl. Exh. 1 at col. 36:27–43). This was usually done through the user's computer terminal. The user's terminal was equivalent to the user node in claim 41, which the '837 patent defined as "typically a personal computer" (col. 3:38–39). EIT does not contest this point.

5

The user's information was received by the proxy server through its network communication function (Schmandt Decl. Exh. 1 at col. 34:27–43). As disclosed in the '938 patent, the proxy server's network communication function was equivalent to claim 41's master node. In the claim construction order, "master node" was construed as the "point of connection into a network, through which items [were] transmitted and received, to facilitate communication between an information provider and a user node" (Dkt. No. 134 at 11). The network communication function performed bi-directional routing of communications between the network entities, including the user and information providers (Schmandt Decl. Exh. 1 at col. 34:17–43). This functionality matched the claim construction definition of master node.

EIT contends that claim 41's master node must be a standalone physical structure, not software in the proxy server. This argument was already rejected by the claim construction order (Dkt. No. 134 at 8–11). The order specifically did not limit the meaning of master node to standalone structures, such as servers, because the specification usually did not limit the phrase to hardware or software. Instead, the specification used "master node" as a general sketch of the network architecture. In the specification, a master node could have been in many forms, including a server, computer terminal, software, or file transfer protocol service.

EIT's attempt to add new limitations to the claim construction order's definition of master node is not persuasive. There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed this limitation.

**C. Accessing from the master database user profile information corresponding to the user id and respective network address.**

The '938 disclosed a proxy server that accessed the user-profile information from a database (Schmandt Decl. Exh. 1 at Abstract). This was equivalent to claim 41's limitation of "accessing from the master database user-profile information corresponding to the user id and respective network address."

In the '938 patent, the user-profile information was stored in a database on the proxy server and was keyed to the user's pseudonym (Schmandt Decl. Exh. 1 at col. 32:34–44). Based on the user-profile information, the news-clipping service then determined which news articles were most likely of interest to the user (Schmandt Decl. Exh. 1 at col. 57:15–30). The '938 patent

6

1  disclosed a database equivalent to claim 41's "master database," which was defined by the claim
2  construction order as a "collection of electronic information from which user-profile information
3  can be accessed" (Dkt. No. 134 at 13). The '938 patent's database consisted of a user profile
4  (such as occupation), a target profile interest summary (such as movies), a Boolean combination
5  of access control criteria, and the associated pseudonym (Schmandt Decl. Exh. 1 at col.
6  37:39–44). This matched the claim construction's definition of a master database.

7  EIT argues that the '938 patent did not disclose a process where the *network address* was
8  accessed from the master database. This argument is not persuasive. The '938 specification
9  described a database containing "a set of one-time return *addresses* provided by user" (Schmandt
10 Decl. Exh. 1 at col. 32:34–45) (emphasis added). Under the '938 patent, these user addresses
11 were contained within sets of electronic envelopes that were sent by the user's computer. In turn,
12 the envelopes had return-path directions used by the system to return a message to the user along
13 the path specified by the envelopes (Schmandt Decl. Exh. 1 at col. 39:4–7, 46–54). Because of
14 this functionality, the envelope *necessarily* contained the user's network address (Schmandt Decl.
15 at ¶ 12). No reasonable jury could find otherwise.

16 Moreover, the user terminal and the proxy server were each identified by an IP address on
17 the network through which they communicated (Schmandt Decl. Exh. 1 at col. 29:3–8). As part
18 of the internet protocol, any message sent over the network contained the originating IP address
19 (Schmandt Decl. at ¶ 13). Again, this necessarily meant that the proxy server received the user's
20 network address as part of any request. No reasonable jury could find otherwise.

21 EIT argues that in order to satisfy the claim limitation, the '938 patent must disclose the
22 "the creation of a correspondence between user profile information and a user's network address"
23 (Opp. 9). Assuming, without deciding, that this is true, the limitation was disclosed by the '938
24 patent. In the '938 patent, the network address was *keyed* to the user id (Schmandt Decl. Exh. 1
25 at col. 32:34–44.) This was enough to satisfy a "creation of a correspondence" requirement.[*]

---

[*] Moreover, EIT admitted in its interrogatory answers that the '938 patent disclosed the accessing function. When specifically listing Yelp's prior art references that did not include the accessing function, EIT failed to list the '938 patent (Novikov Decl. Exh. 1 at 8–9).

7

1   There is no genuine dispute over the factual disclosures of the '938 patent. That patent
2   disclosed this limitation.

### D. Transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile.

The '938 patent disclosed a proxy server that accessed the user-profile information to create a list of articles most likely of interest to the user, and then transmitted that list through the network communication function to the user. This was equivalent to claim 41's limitation of "transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile."

The parties dispute the construction of "reference." Construing the term "reference" is necessary to decide this summary judgment motion. The parties previously argued over the meaning of "reference" during the *Markman* proceeding (Dkt. No. 134 at 6). The claim construction order held that the term could not be meaningfully construed at that time. But it also held that if construction of the term "reference" proved necessary, the term would be construed at summary judgment based upon a more fully developed record (Dkt. No. 134 at 8). This order will now construe the term.

Courts must determine the meaning of disputed claim terms from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). A patent's specification is always highly relevant to the claim construction analysis. Courts also have discretion to consider extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and inventors. Such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–15, 1317–18 (Fed. Cir. 2005).

In the specification, a "reference" was something obtained by the master program and then transmitted to the client program in the user node. This enabled the user to reference and download the correct target information (such as advertisements) (col. 4:54–64; fig. 5A). Figure 5A illustrated this point:

8

Figure 5A from the '837 patent



There was nothing in the specification that limited the form a reference could have taken. A reference could have been a line of source code, binary, text, or a list.

EIT's argument that "reference" should be construed as a "dynamic-generated pointer" is not persuasive and was already rejected by the claim construction order. The reasoning from that order still holds true and will not be repeated (Dkt. No. 134 at 6–8). Moreover, in the specification, a reference did not have to be "dynamically generated." In figure 5A, the master program was able to obtain a reference immediately after the user logged in. This meant that the obtained reference was static because it could not have been updated with new user information immediately after the user logged in.

Figure 5A from the '837 patent



In light of the foregoing, the term "reference" shall be construed to mean "something that refers to something else."

Based on this definition, the list of news articles disclosed in the '938 patent qualified as a reference. The list of articles transmitted to the user referred to news articles that the user could then select and retrieve (Schmandt Decl. Exh. 1 at col. 57:15–58:27). The list of articles was transmitted to the user's computer by the proxy server's network communication function. The list consisted of news articles most likely of interest to the user, based on the stored user-profile information (Schmandt Decl. Exh. 1 at col. 57:15–58:27).

There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed this limitation.

### E. Storing a user report from the user node.

The '938 patent disclosed a proxy server that automatically stored user's activities into the user-profile information database (Schmandt Decl. Exh. 1 at col. 5:26–28). This was equivalent to claim 41's limitation of "storing a user report from the user node."

The proxy server collected user feedback from the user's indication of his interest in a particular item, and also inferred interest level from the user's behaviors (Schmandt Decl. Exh. 1 at col. 17:18–44). This feedback was equivalent to claim 41's user report. This feedback was generated from the user's actions on his computer terminal. The user-profile information was subsequently updated with the feedback "to reflect the user's changing interests" so that future results would have reflected the new interest information (Schmandt Decl. Exh. 1 at col. 6:56–58).

EIT contends that claim 41 required that the report itself be stored, and not merely used to update a user profile. This argument is not persuasive. The '938 specification made clear that the feedback (the user report) was generated on the user side (the user node), transmitted to the proxy server, and stored in a database. The text specifically stated that "such feedback [was] *stored* long-term in summarized form, as part of a database of user feedback information" (Schmandt Decl. Exh. 1 at col. 17:23–26) (emphasis added). This was equivalent to the storage requirement in the limitation.

There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed this limitation.

### 3. MEANS-PLUS-FUNCTION CLAIM 40 WAS ANTICIPATED.

The '938 patent invalidated claim 40's function limitations for largely the same reasons it invalidated the method limitations of claim 41. Additionally, since claim 40 was written in means-plus-function form, the anticipating structures in the '938 patent are discussed below.

To anticipate a claim reciting a means-plus-function limitation, the anticipatory reference must disclose the recited function and corresponding structures, or equivalents thereof. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1383 (Fed. Cir. 2001). A substitute structure is "equivalent" for purposes of a means-plus-function claim if it performs the claimed

11

1  function in substantially the same way to achieve substantially the same result as the
2  corresponding structure. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir.
3  1999).

### A. Preamble: a master program module coupled to a master node and a master database for connecting information providers and user nodes for a computer network comprising.

The '938 patent disclosed a proxy server with network communication and database functions that facilitated communications the user and information providers. This matched claim 40's preamble of "a master program module coupled to a master node and a master database for connecting information providers and user nodes for a computer network."

As disclosed in the '938 patent, the proxy server was a server computer with CPU, main memory, secondary disk storage, and multiple functions. The proxy server verified the user's identity and read the user's profile to determine what references to transmit to the user. The proxy server also received the user id and transmitted references (Schmandt Decl. Exh. 1 at col. 32:20–50). This multi-function proxy server was equivalent to the multi-function master program (part of the master program module) in the asserted claim. Below is an illustration of the master program in the asserted patent:

Figure 1 from the '837 patent



1  During the *Markman* proceeding, neither party requested a construction of the term "master
2  program." The specification, however, provided a meaningful definition. A master program was
3  defined as a large server built on database technology (col. 3:50–60). The proxy server disclosed
4  in the '938 patent matched this definition because it was a server that contained numerous
5  database and networking functions.

### B. Means for registering a first-time user of the computer network.

In the '938 patent, a first-time user registered with the proxy server in order to receive a pseudonym (*see* Schmandt Decl. Exh. 1 at col. 37:66–38:4). This was equivalent to claim 40's limitation of "means for registering a first-time user of the computer network."

During the *Markman* proceeding, neither party requested a determination of the corresponding structure for the "means for registering" phrase. Nonetheless, it is clear from the specification that the corresponding structure to the means for registering was the master program. As depicted in Figure 3, the master program checked if the user was registered, presented the registration form to user, and stored the completed form.

Figure 3 from the '837 patent



13

1  As discussed earlier, the proxy server was equivalent to the master program. Thus, the
2  corresponding structure limitation was matched in the prior art as well as the function limitation.
3       There is no genuine dispute over the factual disclosures of the '938 patent. That patent
4  disclosed this limitation.

     **C.    Means for receiving, through the master node, a user id and respective network address corresponding to a current user of the user node.**

     As discussed in relation to claim 41 earlier, the '938 patent disclosed a proxy server that received, through the network connection function, a pseudonym and corresponding network address. This was equivalent to claim 40's limitation of "means for receiving, through the master node, a user id and respective network address corresponding to a current user of the user node." Claim 40's "receiving" function limitation was similar to the receiving function limitation of claim 41. For reasons already discussed, the '938 patent disclosed the function limitation.

     The claim construction order construed the corresponding structure for this receiving function to be the master program (Dkt. No. 134 at 13–15). As discussed earlier, the proxy server was equivalent to the master program. There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed this limitation.

     **D.    Means for accessing from the master database user profile information corresponding to the user id.**

     As discussed in relation to claim 41 earlier, the '938 patent disclosed a proxy server that stored the user-profile information in a database function (Schmandt Decl. Exh. 1 at col. 32:34–44). The information was then accessed by the database function on the proxy server (Schmandt Decl. Exh. 1 at col. 34:27–38). Even though the '938 patent's database function was software on the proxy server and not a standalone physical structure, the database function was equivalent to claim 40's master database. The claim construction order defined "master database" as a "collection of electronic information from which user profile information can be accessed" (Dkt. No. 134 at 13). Despite EIT's contentions otherwise, there was no requirement for a standalone physical structure to store the database. Therefore, the proxy server, with its database function, was equivalent to claim 40's limitation of "means for accessing from the master database user profile information corresponding to the user id."

14

1    During the *Markman* proceeding, neither party requested a determination of the
2 corresponding structure for the "means for accessing" phrase. Nonetheless, it is clear from the
3 specification that the corresponding structure for this function was the master program. As
4 depicted in Figure 1, the master program was the corresponding structure that accessed the master
5 database:

Figure 1 from the '837 patent



16   EIT argues that the corresponding structure to this means-for limitation must be a master
17 program with the Sybase SQL-Server. This meant that the master program operated using SQL,
18 the brand of software in the '837 patent's preferred embodiment. EIT made a similar argument
19 during the *Markman* proceeding that the "means for storing" structure had to be a master program
20 using SQL. The claim construction order rejected EIT's argument and held that only a master
21 program was required. So too here.
22   The Sybase SQL Server was simply a particular brand of commercially available software
23 that could have performed the step of accessing information from a database. In fact, the
24 specification specifically explained that although the master program was "preferably built on a
25 Sybase SQL-Server platform[,] one of ordinary skill can easily substitute the Sybase SQL-Server
26 with other similar database technology" (col. 3:50–54). The order does not read into the "means
27 for accessing" function a requirement to use any particular server software.
28

1    Although the '938 patent did not specify whether the proxy server's database function was
2    implemented using SQL software, it did not need to. The database function accessed user-profile
3    information in the same way (by querying a database for the relevant information), and with the
4    same result (the correct information was retrieved) as would have been achieved with a SQL
5    server (Schmandt Decl. at ¶ 21 n.1). The proxy server with database function was thus equivalent
6    to the corresponding structure in this means-for limitation. EIT has not raised any dispute of
7    material fact on this point; it has not identified any respect in which the '938 patent's database
8    function had a different function, worked in a different way, or achieved a different result than the
9    means-for claim.

10    The proxy server with its database function was equivalent to the corresponding structure
11    in the means-for limitation. There is no genuine dispute over the factual disclosures of the '938
12    patent. That patent disclosed this limitation.

### E. Means for transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile.

As discussed in relation to claim 41 earlier, the '938 patent disclosed a proxy server that transmitted a list of articles most likely to be of interest to the user. This was equivalent to the claim 40 limitation of "transmitting to the user node, through the master node, a reference to target information corresponding to the accessed user profile."

The claim construction order held that the corresponding structure for the "means for transmitting" was a master program (Dkt. No. 134 at 16–17). As discussed earlier, the proxy server was equivalent to the master program. There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed both the function and structure limitations.

### F. Means for storing a user report from the user node.

As discussed in relation to claim 41 earlier, the '938 patent disclosed a proxy server that automatically updated the user's profile based on the user's activities on the system (Schmandt Decl. Exh. 1 at col. 5:26–28). This was equivalent to claim 40's limitation of "storing a user report from the user code."

16

Here, too, the claim construction order held that the corresponding structure for the "means for storing" was a "master program." As discussed earlier, the proxy server was equivalent to the master program. There is no genuine dispute over the factual disclosures of the '938 patent. That patent disclosed both the function and structure limitations.

> \*          \*          \*

To sum up, each limitation of the asserted claims was disclosed in the '938 patent prior art. Both asserted claims are invalid as anticipated.

### 4. OTHER CONTENTIONS NOT ADDRESSED.

This order finds that the asserted claims are invalid as being anticipated by the '938 patent. As such, there is no need to reach Yelp's other invalidity arguments: anticipation by the Fishwrap prior art, obviousness, and indefiniteness.

### CONCLUSION

For the reasons stated, the motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Dated: January 20, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17